# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOYCE AUMA OMBESE ABUR, et al.,

   Plaintiffs,

      v.                                           Civil Action No.  02-1188 (JDB)

REPUBLIC OF SUDAN, et al.,

   Defendants.

## MEMORANDUM OPINION

Through this civil action, plaintiffs seek to hold two foreign countries financially responsible for the 1998 terrorist bombings of the United States embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya, which resulted in the deaths of at least 224 individuals and caused physical injury to more than 4,000 others.  Neither of the sovereign defendants -- the Republic of Sudan and the Islamic Republic of Iran -- have appeared before the Court to defend against the claims made by these 114 plaintiffs, who have demanded more than one billion dollars in damages based on provisions of the Foreign Sovereign Immunities Act ("FSIA") that revoke jurisdictional protection for foreign governments in certain circumstances.  The allegations of the complaint are essentially identical to those made in two other cases on the Court's docket:  Owens v. Republic of Sudan, No. 01-CV-2244 (D.D.C.), and Khaliq v. Republic of Sudan, No. 04-CV-1536 (D.D.C.).[1]  Simply put, plaintiffs in all three cases contend that the governments of Sudan

_____

[1] In this complaint, however, there are more specific allegations regarding the relevant conduct of Iran than there are in either the Owens or the Khaliq complaints.  See Fourth Am. Compl. ¶¶ 141(cc)-(ii).

and Iran provided material support to al Qaeda and Hizbollah[2] -- the organizations believed to be

responsible for the bombings -- and thereby assumed liability for the harms caused by the terrorist

attacks and also forfeited any right to immunity from suit in United States courts.[3]  The claims

asserted in this action, however, differ from the claims in Owens and Khaliq in one significant

respect:  the nationalities of the plaintiffs.  Whereas the Owens and Khaliq plaintiffs are United

States citizens, nearly all the plaintiffs here are citizens of Kenya.[4]  That fact, as this opinion will

_____

[2] Transliteration of these organizations' names has produced various spellings.  For ease of reference, "al Qaeda" and "Hizbollah" are used herein, except where an alternate spelling is reflected in a quoted document or case.

[3] The oldest of the three cases, Owens, is on appeal before the United States Court of Appeals for the District of Columbia Circuit, where the Sudanese government is challenging this Court's denial of its jurisdictional objection.  See 412 F. Supp. 2d 99 (D.D.C. 2006).  The Khaliq plaintiffs, meanwhile, are attempting to perfect service of process on the sovereign defendants.

[4] Another distinction is the presence of non-sovereign defendants in this action.  In addition to Sudan and Iran, the named defendants in this action are Wadih el Hage, Khalfan Khamis Mohamed, Mohamed Sadeek Odeh, and Mohamed Rashed Daoud Al-'Owhali -- all of whom presently are serving life sentences at the federal Administrative Maximum prison in Florence, Colorado, for their involvement in the embassy attacks.  See United States v. el Hage, Docket Sheet, No. 98-CR-1023 (S.D.N.Y.).  These four individual defendants were served with the original complaint and answered with blanket denials of all allegations.  One of the individual defendants, el Hage, is an American citizen, see United States v. bin Laden, 92 F. Supp. 2d 225, 229 (S.D.N.Y. 2000) (describing el Hage as a U.S. citizen); thus the claims against him may fall within the jurisdiction of this Court pursuant to 28 U.S.C. § 1332(a)(1)-(2).  Furthermore, section 1332(a)(2) may provide jurisdiction over the claims brought by those plaintiffs who are U.S. citizens against the three individual defendants who are not U.S. citizens.  Because there is no alien-alien diversity jurisdiction, however, any non-federal claims against the three alien defendants by the 112 alien plaintiffs would be within the subject-matter jurisdiction of this Court, if at all, only insofar as they seek damages for "a tort ... committed in violation of the law of nations," within the meaning of the Alien Tort Claims Act (also known as the Alien Tort Statute).  See 28 U.S.C. § 1350; Mwani v. bin Laden, 417 F.3d 1, 14 (D.C. Cir. 2005); Sosa v. Alvarez-Machain, 542 U.S. 692, 724-28 (2004).  Given that the present complaint (styled as the "Fourth Amended Complaint") neither cites section 1350 as a possible source of jurisdiction nor makes reference to international law as a source of substantive law for plaintiffs' claims, as earlier versions of the complaint had, the Court concludes that the Kenyan plaintiffs have abandoned any claims they previously asserted against the three individual defendants who are not U.S. citizens.

explain, has ramifications for the viability of many of plaintiffs' claims.

Now pending before the Court is plaintiffs' unopposed motion for entry of default, pursuant to Rule 55(a) of the Federal Rules of Civil Procedure.  Although the entry of default (as opposed to the issuance of a *default judgment*) normally is a ministerial task for the Clerk of the Court, see Fed. R. Civ. P. 55(a), plaintiffs chose to seek entry of default by motion, apparently because of the complexities associated with service of process in civil actions against foreign sovereigns and the fact that proper service is a prerequisite for the Court to obtain personal jurisdiction over a foreign state, see 28 U.S.C. § 1330(b).  By filing the motion, plaintiffs essentially have requested a judicial determination regarding the sufficiency of service.  In response to that motion, the Court, on its own initiative, instructed plaintiffs to provide a memorandum that addressed the factual and legal bases for this Court's exercise of jurisdiction over each of the claims and defendants.  Plaintiffs have complied with that instruction, and the Court therefore will consider at this time both the adequacy of service and whether there exists any basis for subject-matter jurisdiction.

For the reasons that follow, the Court finds that plaintiffs properly have served defendants Sudan and Iran, in accordance with 28 U.S.C. § 1608(a)(3), and it will direct the Clerk of the Court to enter their defaults.  Consistent with the holding in Owens, the Court also finds that jurisdiction is proper over the claims brought by the two U.S.-citizen plaintiffs against Sudan and Iran.  But the Court is compelled to conclude that it lacks subject-matter jurisdiction over the claims against Sudan and Iran brought by the 112 alien plaintiffs, and it will dismiss those claims

pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure.[5]  In the interest of conserving

judicial resources, the Court further concludes that the accompanying order may be appealed

immediately, and the Court therefore will stay these proceedings pending resolution of any

appeals of jurisdictional rulings in this action.  See 28 U.S.C. § 1292(b) (providing that an order

other than a final judgment may be certified for appeal if the district court determines that it

"involves a controlling question of law as to which there is substantial ground for difference of

opinion and that an immediate appeal from the order may materially advance the ultimate

termination of the litigation").[6]

## BACKGROUND

On August 7, 1998, terrorists detonated massive vehicle bombs outside two U.S.

diplomatic outposts in East Africa within a span of just a few minutes.  At approximately 10:30

a.m., a truck that contained a large bomb exploded in the rear parking area of the U.S. Embassy in

---

[5] Although the "restrictive view of sovereign immunity reflected in the FSIA" places on the *defendant* the "burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity," Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000), the Court does not view that jurisdictional presumption as precluding consideration of a potential jurisdictional defect that is evident on the face of the complaint, as is true here.

[6] Even if immediate appeal were not proper, the Court would, in any event, stay all proceedings in this case pending the outcome of the appeal in Owens because of the similarity of the claims.  A favorable ruling for Sudan in the Owens appeal would necessarily preclude the exercise of jurisdiction over the claims of these plaintiffs insofar as they seek damages from the Sudanese government.  Thus, it would make little sense to proceed to an evidentiary hearing on the merits of this case while the Owens appeal is ongoing.  See 28 U.S.C. § 1608(e) ("No judgment by default shall be entered by a court of the United States ... against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court.").  Considerations of judicial efficiency therefore counsel heavily in favor of permitting contemporaneous appellate resolution of the jurisdictional issues decided by this Court in these closely related cases.

Nairobi, Kenya.  The explosion killed 213 people, including forty-four Embassy employees

(twelve of whom were American citizens), and injured an estimated 4,000 people -- mostly

Kenyan civilians -- who were either at the Embassy or in the vicinity.  Minutes later, at

approximately 10:39 a.m., a suicide bomber drove a truck laden with explosives up to a vehicular

gate at the U.S. Embassy in Dar es Salaam, Tanzania, and ignited a blast that killed eleven people

and injured another eighty-five.  See generally Department of State, Report of the Accountability

Review Boards on the Embassy Bombings in Nairobi and Dar es Salaam on August 7, 1998, at

http://www.state.gov/www/regions/africa/accountability_report.html.

Plaintiffs are victims and relatives of victims of these horrific bombings.  Of the 114

plaintiffs,[7] only two -- Gerald Bochart and Trusha Patel -- are United States citizens.  See Fourth

Am. Compl. ¶¶ 4, 92.[8]  Both were injured in the Nairobi bombing.  Another forty-three of the

plaintiffs are Kenyan citizens who were injured in the Nairobi bombing.  See id. at ¶¶ 2, 5, 8, 10,

12, 14, 18, 20, 23, 27, 29, 31, 33, 26, 38-39, 41-42, 44, 46, 48, 50, 52, 54, 56, 58, 60, 62, 64, 66-

67, 69, 71, 73, 75, 77, 79, 81, 83, 85, 87, 89, 95.  One plaintiff is a Kenyan citizen who was

injured in the Dar es Salaam bombing.  See id. at ¶ 116.  The remaining sixty-eight plaintiffs are

Kenyan citizens who, although they were not physically injured in the bombings, are either

---

[7] The Fourth Amended Complaint contained 116 named plaintiffs, but two plaintiffs, Rizwan Khaliq and Jenny Loublom, were voluntarily dismissed from the case without prejudice on December 16, 2005, in light of the fact that they are plaintiffs in the previously mentioned Khaliq case.

[8] Because plaintiffs repeat some paragraph numbers in the Fourth Amended Complaint, see, e.g., Fourth Am. Compl. at 2-3 (restarting paragraph numbering), this opinion will cite all material that precedes paragraph 1 on page 3 by page number rather than by paragraph.  All other citations to the complaint will use paragraph numbers.

married to one of the forty-six injured plaintiffs,[9] or were married in 1998 to someone who was killed in the Nairobi bombing.

The complaint contends that the sovereign defendants -- each of which is (and was in 1998) designated by the State Department as a sponsor of terrorism -- furnished material support to al Qaeda and Hizbollah for the embassy bombings.  See Fourth Am. Compl. ¶¶ 124, 127.  As to Sudan in particular, the complaint alleges that agents of that government furnished Osama bin Laden, the putative leader of al Qaeda, and his associates with shelter, security, financial and logistical support, and business opportunities.  See id. at ¶¶ 141(a)-(bb).  With respect to Iran, the complaint alleges that agents of the Iranian government gave technical assistance and explosives training to al Qaeda.  See id. at ¶¶ 141(cc)-(ii).  All of those actions, plaintiffs contend, led directly to the 1998 embassy bombings in Nairobi and Dar es Salaam and, therefore, not only are sufficient to divest Sudan and Iran of sovereign immunity under the FSIA, but also support plaintiffs' claims for wrongful death, assault and battery, intentional infliction of emotional distress, and loss of consortium under the laws of the plaintiffs' respective home states or countries.[10]

## ANALYSIS

As a court of limited jurisdiction, a federal district court has an "affirmative obligation to

---

[9] One Kenyan-citizen plaintiff, Pankay Patel, is the spouse of a U.S.-citizen plaintiff, Trusha Patel.  See id. at ¶¶ 92-93.

[10] This Court has held in another FSIA terrorism case that the substantive rules of decision for tort claims against foreign states typically are provided by the laws of each plaintiff's domicile as of the date of the injury.  See Dammarell v. Islamic Republic of Iran, 2005 WL 756090 at *21-23 (D.D.C.).  To the extent necessary to impose civil liability under those laws, plaintiffs rely on joint-tort theories such as aiding and abetting and conspiracy.

ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal
Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  That means that this Court
cannot overlook a potential defect in its jurisdiction simply because the parties fail to call it to the
Court's attention.  Nor may the Court "presume the existence of jurisdiction in order to dispose of
a case on other grounds."  Tuck v. Pan Am. Health Org., 668 F.2d 547, 549 (D.C. Cir. 1981).  In
all cases, this independent obligation means the Court must satisfy itself that it possesses
jurisdiction to rule on the merits of the claim.  See Fed. R. Civ. P. 12(h)(3) ("Whenever it appears
by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the
court shall dismiss the action.").  Furthermore, in cases where a defendant has not appeared, the
Court is obliged to consider whether it properly has jurisdiction over that person or entity.  See
Mwani, 417 F.3d at 6 ("[A] court should satisfy itself that it has personal jurisdiction before
entering judgment against an absent defendant.").

   Jurisdiction over any civil action against a foreign state is governed by the FSIA.  See 28
U.S.C. § 1330; Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989)
("[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of
this country[.]").  The "interlocking provisions" of that statute, Mar. Int'l Nominees Estab't  v.
Republic of Guinea, 693 F.2d 1094, 1099 (D.C. Cir. 1982), compress subject-matter jurisdiction
and personal jurisdiction into a single, two-pronged inquiry:  (1) whether service of the foreign
state was accomplished properly, and (2) whether one of the statutory exceptions to sovereign
immunity applies.  See 28 U.S.C. §§ 1330(a)-(b); see also Mar. Int'l Nominees Estab't, 693 F.2d at
1099 ("[T]he absence of immunity is a condition to the presence of subject matter jurisdiction. ...
[And] a lack of subject matter jurisdiction also deprives the court of personal jurisdiction[.]");

Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 89 (D.C. Cir. 2002) (observing

that section 1330(b) provides that, "[i]f service of process has been made under [section] 1608,

personal jurisdiction over a foreign state exists for every claim over which the court has subject

matter jurisdiction," and that section 1330(a), in turn, "automatically confers subject matter

jurisdiction whenever the state loses its immunity") (citation omitted); Practical Concepts, Inc. v.

Republic of Bolivia, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987) (stating that, under the FSIA,

"subject matter jurisdiction plus service of process equals personal jurisdiction").[11]   In other

words, the Court may proceed to consider the merits of a claim against a foreign state only if

proper service is effectuated *and* one of the FSIA's enumerated exceptions to sovereign immunity

applies to that claim.   The Court considers below whether each of these necessary conditions has

been met.

## I.      Service of Process

The FSIA prescribes four methods for serving legal process on a foreign state, in

descending order of preference -- meaning that a plaintiff must attempt service by the first method

(or determine that it is unavailable) before proceeding to the second method, and so on.  See 28

U.S.C. § 1608(a).  The preferred method of service is delivery of the summons and complaint "in

accordance with any special arrangement for service between the plaintiff and the foreign state."

28 U.S.C. § 1608(a)(1).  If, however, no such arrangement exists, then the statute permits delivery

of the summons and complaint "in accordance with an applicable international convention on

service of judicial documents."  28 U.S.C. § 1608(a)(2).  If neither of the foregoing methods is

---

[11] The Constitution's Due Process Clause imposes no limitation on a court's exercise of
personal jurisdiction over a foreign state because a foreign state is not a "person" within the
meaning of the Fifth Amendment.  See Price, 294 F.3d at 95-100.

available, then the plaintiff may send the summons, complaint, and a notice of suit (together with a translation of each into the official language of the foreign state) "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." 28 U.S.C. § 1608(a)(3).  Finally, if mailed service cannot be accomplished within thirty days, then the statute permits the plaintiff to request that the clerk of the court dispatch two copies of the summons, complaint, and notice of suit (together with a translation of each into the foreign state's official language) to the Secretary of State, who then "shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted."  28 U.S.C. § 1608(a)(4).  "Strict adherence to the terms of 1608(a) is required" in this Circuit.  Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 154 (D.C. Cir. 1994).

Because plaintiffs had no "special arrangement" for service with either Sudan or Iran and because neither country is a party to an "international convention on service of judicial documents," the preferred method of service is provided by section 1608(a)(3) -- that is, any form of mail requiring a signed receipt.  In accordance with this statutory requirement, plaintiffs utilized the commercial courier service DHL International.  See Pls.' Mem. Re: Sufficiency of Service at 3.  The Clerk of this Court has certified that the mailing via DHL -- dispatched on April 23, 2004 -- complied with the content requirements of section 1608(a)(3).  See id. at ex. C. Plaintiffs also have come forward with evidence that the packages were in fact delivered to, and accepted by, the respective ministries of foreign affairs of Sudan and Iran.  Specifically, they have produced airbills that provide tracking numbers for the outgoing packages, see id. at ex. C, and

they also have provided corresponding tracking receipts from DHL that indicate that delivery to

Iran was completed on May 1, 2004, at 8:51 a.m., and signed for by "Mil Room" (perhaps a

designation for the ministry's mail room), and that delivery to Sudan was completed on May 2,

2004, at 12:34 p.m., and signed for by "El Tayb."  See id. at exs. D, E.  Of equal or greater

evidentiary significance, however, are the DHL delivery logs, which reflect a recipient's signature

(apparently in Arabic script) for the delivery to the Sudan ministry and some type of stamp or seal

for the delivery to the Iran ministry.  See id. at ex. A.

Counsel for plaintiffs concede that they are aware of no other case against Sudan or Iran in

which service was accomplished pursuant to section 1608(a)(3), and this Court -- which has

presided over numerous civil proceedings against Iran and one other case against Sudan in which

service has been achieved -- likewise has not observed any successful service by mail.

Notwithstanding the apparent uniqueness of these circumstances, however, the Court concludes

that plaintiffs here have complied with the requirements of section 1608(a)(3).  The evidence

before the Court reflects "active participation" on the part of both the dispatcher and the

recipients, see Phoenix Consulting, Inc. v. Republic of Angola, 35 F. Supp. 2d 14, 19 (D.D.C.

1999), rev'd on other grounds, 216 F.3d 36 (D.C. Cir. 2000), and therefore plaintiffs have fulfilled

"[t]he core function of service," which is "to supply notice of the pendency of a legal action, in a

manner and at a time that affords the defendant a fair opportunity to answer the complaint and

present defenses and objections," see Henderson v. United States, 517 U.S. 654, 671 (1996).

The Court sees no reason to demand anything more of plaintiffs with respect to service.

Indeed, if the Court were now to require plaintiffs to serve Sudan and Iran through diplomatic

channels, it would not only appear to be an exercise in redundancy, but it also would thwart the

explicit congressional preference for service by mail whenever possible -- a preference that

undoubtedly reflects a desire to conserve State Department resources (not to mention the goodwill

of diplomatic intermediaries), which are depleted by every civil action where plaintiffs must resort

to the provisions of section 1608(a)(4).  Accordingly, the Court will direct the Clerk to enter

defaults in this civil action against defendants Sudan and Iran, pursuant to Rule 55(a) of the

Federal Rules of Civil Procedure.

## II.    Exceptions to Sovereign Immunity

Because plaintiffs have established proper service of process, the only potential obstacle

that would prevent the Court from proceeding to the merits of the claims is subject-matter

jurisdiction.  As explained above, the Court will have subject-matter jurisdiction over any claim

that falls within one of the exceptions to sovereign immunity enumerated in section 1605 of the

FSIA.  Plaintiffs contend that three of these exceptions are applicable:  (1) occurrence of tortious

injury or death in the United States, (2) provision of material support by an agent of a terrorist-

sponsoring state for an act of extrajudicial killing that leads to the injury or death of a United

States national, and (3) waiver of immunity by implication.  As the following analysis will show,

only one of these three exceptions applies in this case, and it applies just to the claims of the two

U.S.-citizen plaintiffs.  Hence, the Court must dismiss for want of subject-matter jurisdiction the

claims against Sudan and Iran brought by the 112 Kenyan plaintiffs.

### A.    Occurrence of Tortious Injury or Death "in the United States"

Plaintiffs assert that the claims of all plaintiffs fall within the statutory exception to

sovereign immunity for cases "in which money damages are sought against a foreign state for

personal injury or death ... *occurring in the United States* and caused by the tortious act or

omission of that foreign state or of any official or employee of that foreign state while acting

within the scope of his office or employment."  28 U.S.C. § 1605(a)(5) (emphasis supplied).

Evidently, plaintiffs' theory is that personal injury or death that occurs at a U.S. embassy actually

"occur[s] in the United States," for purposes of the FSIA, because the FSIA defines "United

States" to include all "territory and waters, continental and insular, subject to the jurisdiction of

the United States," 28 U.S.C. § 1603(c), and U.S. embassy grounds are, in some legal senses,

treated as U.S. soil, and thus "subject to the jurisdiction of the United States."[12]

As plaintiffs candidly acknowledge, however, this theory runs headlong into controlling

precedent that rejects such an expansive reading of section 1605(a)(5) -- a statutory provision that

was "directed primarily at the problem of traffic accidents" caused by foreign diplomats on U.S.

roads.  See Persinger v. Islamic Republic of Iran, 729 F.2d 835, 840, 842 (D.C. Cir. 1984)

(holding, in a civil action brought against Iran by Americans who were held hostage at the U.S.

embassy in Tehran from 1979 to 1981, that section 1605(a)(5) did not "abrogate the immunity

generally enjoyed by a foreign sovereign for tortious acts at embassies within its own territory");

see also Amerada Hess, 488 U.S. at 440 (construing "the modifying phrase 'continental and

insular' [-- as used in section 1603(c) --] to restrict the definition of United States [for purposes of

FSIA section 1605(a)(5)] to the continental United States and those islands that are part of the

United States or its possessions").  Granted, the circumstances of this case are somewhat

distinguishable from those of Persinger, because here the embassies where the tortious acts

occurred were not within the territory of either Sudan or Iran, whereas in Persinger the torts were

---

[12] Plaintiffs do not actually articulate their theory as to how section 1605(a)(5) applies to their claims, except to say that they "reserve this question for potential future review at the appropriate level."  Pls.' Mem. on Jurisdiction at 1 n.1.

committed at an embassy in the defendant's territory.  But the Court nevertheless finds the

rationale of Persinger, as well as the subsequent interpretation of section 1605(a)(5) by the

Supreme Court in Amerada Hess, to be dispositive.  As the D.C. Circuit has observed, the FSIA

"is not a particularly generous" jurisdictional grant, Peterson v. Royal Kingdom of Saudi Arabia,

416 F.3d 83, 86 (D.C. Cir. 2005), and therefore this Court will not liberally construe the terms of

the statute to extend to situations not clearly contemplated by Congress.  In short, the exception to

foreign-sovereign immunity contained in section 1605(a)(5) does not apply to any of plaintiffs'

claims in this action, and therefore section 1605(a)(5) cannot provide a basis for subject-matter

jurisdiction.

> B.     *Material Support by a Terrorist-Sponsoring Nation for Extrajudicial Killing*

As an alternative to section 1605(a)(5), plaintiffs contend that section 1605(a)(7) provides

an exception to sovereign immunity that is applicable to at least some of their claims.  Enacted as

part of the Antiterrorism and Effective Death Penalty Act of 1996, section 1605(a)(7) of the FSIA

removes the immunity of foreign states (as well as their agents and instrumentalities) -- and thus

confers subject-matter jurisdiction on this Court -- in any civil action

> in which money damages are sought against a foreign state for personal injury or death that
> was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or
> the provision of material support or resources (as defined in section 2339A of title 18) for
> such an act if such act or provision of material support is engaged in by an official,
> employee, or agent of such foreign state while acting within the scope of his or her office,
> employment, or agency, *except that the court shall decline to hear a claim under this
> paragraph* ... if the foreign state was not designated as a state sponsor of terrorism under
> section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section
> 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371) at the time the act occurred,
> unless later so designated as a result of such act ... [or,] even if the foreign state is or was
> so designated, *if ... neither the claimant nor the victim was a national of the United States*
> (as that term is defined in section 101(a)(22) of the Immigration and Nationality Act) when
> the act upon which the claim is based occurred.

28 U.S.C. §§ 1605(a)(7) (emphasis supplied).[13]

Because of the limitations contained in the statute's declination clause, plaintiffs properly concede that this exception to foreign sovereign immunity applies only to claims brought by (or on behalf of) individuals who are "national[s] of the United States."   See Pls.' Mem. on Jurisdiction at 2-5; see also Fourth Am. Compl. at 1 ("Regarding the two U.S. nationals, subject matter jurisdiction is properly asserted under 28 U.S.C. § 1605(a)(7).").  Thus, in the first instance, the Court can rule out section 1605(a)(7) as a possible jurisdictional basis for the claims brought here by (or on behalf of) Kenyan citizens.  That is because, in order to be a "national" of the United States, within the meaning of this statute, one must either be "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States," 8 U.S.C. § 1101(a)(22), and, with one possible exception, there are no allegations that the Kenyan citizens fall into either category.  As for that one possible exception, the Court finds meritless plaintiffs' assertion that Kenyan citizen Pankay Patel is a U.S. national by virtue of marriage to a U.S. citizen, Trusha Patel.[14]  By any measure, marriage alone

---

[13]   The FSIA adopts the definition of "extrajudicial killing" in the Torture Victim Protections Act ("TVPA").  See 28 U.S.C. § 1605(e).  The TVPA defines "extrajudicial killing" as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees ...."  28 U.S.C. § 1350 note.  Section 1605(a)(7) also incorporates the definition of "material support or resources" in 18 U.S.C. § 2339A, a statute that makes the provision of material support or resources -- knowing or intending that it will be used to commit one of several other crimes -- a federal offense.  At the time of the filing of this suit in 2002, that statute defined "material support or resources" as "currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials."  18 U.S.C. § 2339A(b) (2002).

[14]  Although the complaint refers to the existence of only "two U.S. nationals" among the plaintiffs, see Fourth Am. Compl. at 1 (presumably referring to the two U.S. citizens, Gerald

does not confer "national" status on a non-U.S. citizen.  Indeed, federal courts have held that even

"a long period of residence in the United States, military service and/or registration with the

Selective Service, and completing a portion of the naturalization process (including an oath of

allegiance)" will not suffice to confer "national" status under 8 U.S.C. § 1101(a)(22).  Abou-

Haidar v. Gonzales, 437 F.3d 206, 207 (1st Cir. 2006) (summarizing cases that have interpreted

section 1101(a)(22)).  See also Marquez-Almanzar v. INS, 418 F.3d 210, 217-19 (2d Cir. 2005)

(explaining that section 1101(a)(22)(B) refers only to the "four categories of persons," described

in 8 U.S.C. § 1408, who are "nationals, but not citizens, of the United States at birth," and

therefore holding that "one cannot qualify as a U.S. national under 8 U.S.C. § 1101(a)(22)(B) by a

manifestation of 'permanent allegiance' to the United States"); Salim v. Ashcroft, 350 F.3d 307,

310 (3d Cir. 2003) ("[F]or one ... who is a citizen of another country, nothing less than citizenship

will show 'permanent allegiance to the United States.'"); Miller v. Albright, 523 U.S. 420, 467 n.2

(1998) (Ginsburg, J., dissenting) ("The distinction [between nationality and citizenship reflected

in 8 U.S.C. § 1101(a)(22)] has little practical impact today, ... for the only remaining noncitizen

nationals are residents of American Samoa and Swains Island.")[15]  To the extent that this Court

---

Bochart and Trusha Patel, see id. at ¶¶ 4, 92), plaintiffs' subsequent memorandum of law on
subject-matter jurisdiction asserts that there are *three* U.S. nationals who are plaintiffs: Bochert,
Trusha Patel, and Pankay Patel, Trusha Patel's spouse.  See Pls.' Mem. on Jurisdiction at 2 n.2.

[15] The Fourth Circuit is the only federal court of appeals to interpret section 1101(a)(22)
more broadly.  See United States v. Morin, 80 F.3d 124, 126 (4th Cir. 1996) (concluding that "a
permanent resident alien of the United States who had applied for United States citizenship"
qualified as a "national of the United States" within the meaning of 8 U.S.C. § 1101(a)(22), as
incorporated in a federal murder statute).  That interpretation of section 1101(a)(22), however, did
not carry weight with a subsequent Fourth Circuit panel.  See Daly v. Gonzales, 129 Fed. Appx.
837, 840 n.3 (4th Cir. 2005) (unpublished disposition) (stating that Morin's interpretation of
section 1101(a)(22) "is not controlling" outside the context of the murder statute); id. at 842 ("[I]n
the immigration context, an alien does not become a national of the United States simply by

previously has suggested that a person who is neither a United States citizen nor born within a United States territory could acquire "national" status by means other than completion of the naturalization process, see Asemani v. Islamic Republic of Iran, 266 F. Supp. 2d 24, 26-27 (D.D.C. 2003), the Court now expressly rejects that position.

Having thus eliminated section 1605(a)(7) as a basis for subject-matter jurisdiction over the majority of the claims in this case, the Court still must consider whether the claims of the two U.S. citizens, Gerald Bochart and Trusha Patel, contain allegations that are sufficient to satisfy the other requirements for application of the terrorism-sponsorship exception to sovereign immunity (i.e., that their claims seek money damages for personal injury that was caused by the provision of material support or resources for an act of extrajudicial killing and that the alleged provision of support or resources was done by an official, employee, or agent of the foreign state who was acting within the scope of his or her office, employment, or agency).  For the reasons fully explained in Owens, 412 F. Supp. 2d at 105-15, the Court concludes that the allegations of this substantially identical complaint are legally sufficient to withdraw sovereign immunity from Sudan and Iran with respect to the claims of plaintiffs Bochart and Trusha Patel (and thus also are sufficient to confer on this Court subject-matter jurisdiction over those claims), pursuant to section 1605(a)(7).[16]

---

completing an application for naturalization and giving a statement of allegiance.").

[16] The Owens opinion addressed only the Sudan defendants' jurisdictional challenge, which was based on sovereign immunity.  Iran, as has been its customary practice, did not make an appearance in that case.  Hence, the Court did not independently inquire into the factual basis for exercising jurisdiction over the claims against Iran.  Implicit in the Owens decision, however, was the Court's conclusion that there was no jurisdictional obstacle to consideration of the merits of the claims of U.S. citizens against Iran.  Given that the allegations against Iran are even more detailed in this case, the Court likewise concludes that there is a sufficient legal basis for the

C.      *Implicit Waiver of Sovereign Immunity Based on Conduct*

Finally, plaintiffs resort to the exception to foreign-sovereign immunity, codified at section 1605(a)(1) of the FSIA, for cases "in which the foreign state has waived its immunity either explicitly or by implication." See 28 U.S.C. § 1605(a)(1).  Plaintiffs advance an interpretation of section 1605(a)(1) that would create a form of supplemental subject-matter jurisdiction over claims for terrorism-related injuries brought by non-U.S. nationals.  According to plaintiffs' theory, Sudan and Iran implicitly waived their sovereign immunity for *all* claims arising out of their "non-immune conduct" -- that is, the conduct that forfeited sovereign immunity for the claims of the U.S.-citizen plaintiffs pursuant to section 1605(a)(7).  In other words, in plaintiffs' view, if Sudan and Iran are subject to suit in this Court by U.S. nationals under section 1605(a)(7), then they also are subject to suit here by aliens for the same conduct, based on implied waiver. See Pls.' Mem. on Jurisdiction at 10 ("Iran and the Sudan indicated their amenability to suit by aiding and abetting or conspiring with a terrorist group to bomb [U.S.] embassies because such activity excepted Iran and the Sudan from immunity under 28 U.S.C. § 1605(a)(7).").

The Court, however, finds plaintiffs' interpretation of section 1605(a)(1) untenable for two reasons.  First, it is inconsistent with the well-established rule that "the implied waiver provision of Section 1605(a)(1) must be construed narrowly." Smith v. Socialist People's Libyan Arab Jamahiriya, 101 F.3d 239, 243 (2d Cir. 1997) (quoting Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1017 (2d Cir. 1991)).  Second, such an interpretation of section 1605(a)(1) would essentially amount to a judicially created amendment to the declination clause of section 1605(a)(7), which, of course, is beyond the scope of this Court's power (or, for that matter, any federal court's power).

exercise of jurisdiction over the claims against Iran made by plaintiffs Bochart and Trusha Patel.

-17-

Courts, including this Court, have declined to extend the application of section 1605(a)(1)

much beyond the two traditional examples of implied waiver:  (1) agreements about forum

selection, choice of law, or arbitration, and (2) submission of a responsive pleading without

raising the defense of sovereign immunity.  See Princz v. Fed. Republic of Germany, 26 F.3d

1166, 1174 (D.C. Cir. 1994) (referring to the examples provided by the legislative history of the

FSIA, H.R. Rep. No. 94-1487, at 18 (1976) & S. Rep. No. 94-1310, at 18 (1976)); Doe v. Israel,

400 F. Supp. 2d 86, 105 (D.D.C. 2005) ("Section 1605(a)(1) is construed narrowly; the judiciary

is not to re-draft the FSIA so as to force an exception that Congress did not craft."); see also

Smith, 101 F.3d at 244 ("Congress primarily expected courts to hold a foreign state to an implied

waiver of sovereign immunity by the state's *actions in relation to the conduct of litigation*.")

(emphasis supplied).  In Princz, the D.C. Circuit rejected an argument very similar to that raised

by plaintiffs here:  that waiver of sovereign immunity is implied whenever a country violates *jus*

*cogens* norms of the law of nations.  The court said that such a theory of implied waiver was

"incompatible with the intentionality requirement implicit in [section] 1605(a)(1)."  Princz, 26

F.3d at 1174; see also Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 444

(D.C. Cir. 1990) ("Congress anticipated ... that waiver would not be found absent a conscious

decision to take part in the litigation and a failure to raise sovereign immunity despite the

opportunity to do so.") (quoting Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370,

378 (7th Cir.1985)).  Moreover, another judge of this court rejected this precise theory in a suit

against Afghanistan by Kenyan citizens who were victims of the 1998 embassy bombing in

Nairobi.  See Mwani v. United States, No. 99-CV-125, slip op. at 10-11 (D.D.C. June 22, 2004),

aff'd in part and rev'd in part on other grounds sub nom. Mwani v. bin Laden, 417 F.3d 1, 15 (D.C.

Cir. 2005) (noting that plaintiffs on appeal abandoned their reliance on the implied-waiver

theory).

Although plaintiffs propose a narrow application of the implied-waiver exception --

whereby implied waiver by virtue of terrorist sponsorship would be limited to circumstances in

which forfeiture of immunity under section 1605(a)(7) was foreseeable, such as where the terrorist

activities *directly* targeted U.S. nationals -- that approach does not address the issue that Princz

said was the touchstone of section 1605(a)(1):  whether the foreign state "actually indicated, even

implicitly, a *willingness* to waive immunity."  See 26 F.3d at 1174 (emphasis supplied).  The

allegation that Sudan and Iran proceeded with their terrorist sponsorship knowing that doing so

might subject them to suits by U.S. nationals in U.S. courts (which is a questionable proposition

insofar as the actions of Sudan and Iran preceded the 1996 amendment of the FSIA) is insufficient

to support a finding that these nations willingly waived their immunity from suits by other

individuals injured as a result of the same conduct.  In sum, there simply is no basis for finding

that either Sudan or Iran, by providing material support for terrorist groups that intended to target

American citizens, "indicated its amenability to suit" by citizens of other nations in U.S. courts.

See id.  Thus, section 1605(a)(1) is inapplicable to the claims of the Kenyan citizens here.

Even if the limited application of section 1605(a)(1) were not so clear, the text of the FSIA

provides another reason for rejecting plaintiffs' suggestion that it applies to the claims of the

Kenyan citizens in this case.  Applying section 1605(a)(1) as plaintiffs suggest would eliminate a

key part of the "delicate legislative compromise" reflected in section 1605(a)(7).  See Price, 294

F.3d at 89.  If this Court were to find an exception to sovereign immunity for the claims of the

Kenyan citizens against Sudan and Iran based on a waiver implicit in sponsorship of terrorism that

targets Americans, and thereby permit suits by non-U.S. nationals against foreign sovereigns for injuries caused by their support of terrorist activities, the Court would effectively read out of the FSIA a portion of the declination clause of section 1605(a)(7) -- that "the court shall decline to hear a claim under this paragraph ... if ... neither the claimant nor the victim was a national of the United States ... when the act upon which the claim is based occurred."  28 U.S.C. § 1605(a)(7). Had Congress intended to create the exception to sovereign immunity urged by plaintiffs, it could have accomplished that result by changing one word of section 1605(a)(7), so that it would read: "the court shall decline to hear a claim under this paragraph ... if ... neither the claimant nor *any* victim was a national of the United States ... when the act upon which the claim is based occurred."  But Congress did not enact such language, and this Court will not impute that editorial revision through the interplay of sections 1605(a)(1) and 1605(a)(7), as plaintiffs propose.

## CONCLUSION

For the foregoing reasons, and upon consideration of the entire record, the Court will (1) direct the Clerk of the Court to enter defaults against defendants Sudan and Iran, (2) dismiss for want of subject-matter jurisdiction the claims brought by the 112 alien plaintiffs against Sudan and Iran, (3) certify the accompanying order for immediate appeal, pursuant to 28 U.S.C. § 1292(b), and (4) stay these proceedings pending resolution of any appeals of jurisdictional rulings in this action.  A separate order has been issued herewith.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated:   July 10, 2006

Copies to:

John Arthur Eaves, Jr.
EAVES LAW FIRM
101 North State Street
Jackson, MS  39201-2811
Email: johnjr@eaveslaw.com

Steven R. Perles
PERLES LAW FIRM, P.C.
1146 19th Street, NW, 5th Floor
Washington, DC  20036
Email: sperles@perleslaw.com

James Roger Franks, Jr.
William R. Wheeler, Jr.
WHEELER & FRANKS
P.O. Box 681
Tupelo, MS  38802

*Counsel for plaintiffs*